IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAN JUAN CITIZENS ALLIANCE, et al,

      Plaintiffs,

v.                                                                        No. CIV 04-1038 JCH/RLP

GALE NORTON, et al,                                         **FILED**
                                                                          UNITED STATES DISTRICT COURT
      Defendants,                                            ALBUQUERQUE, NEW MEXICO

and                                                                       SEP 3 0 2008

SOUTHERN UTE INDIAN TRIBE, et al,

      Defendants-Intervenors.                         **MATTHEW J. DYKMAN**
                                                                               CLERK

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiffs' *Petition for Review of Agency Action* [Doc. 29], filed March 30, 2005. This case concerns a dispute over whether the United States Bureau of Land Management ("BLM") followed federal laws when approving a new plan for land management in northwest New Mexico's San Juan Basin, which included additional oil and gas development.[1] The Court's function in a case seeking review of agency action is to review the record of the agency's decision-making process to determine whether the agency's decision was based on a consideration of the legally relevant factors and if the agency's decision was arbitrary and capricious. Having exhaustively reviewed the voluminous record in this case and having considered the petition, briefs, relevant law, arguments of the parties at a hearing held on October 9, 2007, and the submitted supplemental authorities, and being otherwise fully

---

[1]The new plan does not authorize any specific development activities. Any new drilling must comply with the permitting process, which includes appeal rights.

informed, the Court finds that BLM acted appropriately and in accordance with the law so that Plaintiffs' petition is not well taken and should be denied.

## FACTUAL BACKGROUND

In March 2003, the Farmington Field Office of the BLM issued a revised Resource Management Plan ("RMP") for northwest New Mexico's San Juan Basin and a Final Environmental Impact Statement ("FEIS") related to that plan. In December 2003, BLM issued its Record of Decision ("ROD") adopting the RMP and FEIS. Plaintiffs, a collection of conservation groups, individual ranchers, Navajo Chapters, and Native American interest groups, contend that BLM violated the National Environmental Policy Act ("NEPA"), National Historic Preservation Act ("NHPA"), and the Federal Land Policy Management Act ("FLPMA") in adopting the RMP and FEIS. Plaintiffs argue that, in developing its management plan for the San Juan Basin ("SJB"), BLM did not sufficiently consider development alternatives that would afford greater protection to the environment and cultural assets.

The SJB straddles the New Mexico-Colorado border and encompasses a population of approximately 175,000 people and 16,000 square miles. Administrative Record ("AR") 3:1.18 at 61.[2] It contains the San Juan River, a major watershed, as well as sacred Native American sites, cultural resources, and other recreational lands. The New Mexico portion of the SJB encompasses one of the largest natural gas fields in the United States and has been under development for more than 50 years. Virtually all of its lands with high oil and gas potential

_____

[2]The Administrative Record ("AR") filed by federal defendants was contained on 3 compact discs containing 127 folders and numerous subfolders. The pages of the record are not consecutively paginated. Thus, citations to the record in this opinion refer to the CD number, followed by the folder number, subfolder number, and then the internal page number of the .pdf document. For example, "AR 3:1.18 at 61" refers to CD number 3, folder number 1, subfolder number 18, at page 61 of the .pdf file.

have already been leased, and the area contains approximately 18,000 active oil and gas wells and 15,000-20,000 miles of roads. "Over 50 years of development have left no large blocks of unfragmented habitat." FEIS at 2-248.[3] Accelerated natural gas development is also planned in the SJB on the adjacent Southern Ute Reservation and San Juan National Forest, both in Colorado, and in Carson National Forest in New Mexico.

In 1988, BLM approved the first RMP for the Farmington Field Office ("FFO") area, which encompasses 1.4 million acres of BLM-administered public lands, 8 millions acres of mixed ownership land, and 3 million acres of subsurface minerals. BLM amended this RMP six times between 1990 and 2000, primarily to ensure that the planning document kept pace with the increasingly dense gas development sought by lessees in the planning area. In 1991, BLM approved the "Oil and Gas Leasing Development Amendment" to the RMP, which authorized drilling of an additional 4,465 wells with up to 28,130 acres of new surface disturbance over the 20-year period spanning 1991 to 2011. AR 1:1.03 at 54. However, BLM concedes that by 2001 both the number of wells and the area of disturbance already exceeded the development authorized in the 1991 RMP. FEIS at 4-121.

Therefore, in August 2000, the FFO initiated the preparation of an RMP revision and accompanying Environmental Impact Statement ("EIS") to guide land use and management for the next twenty years, and to update the management constraints on oil and gas development. The new RMP, at the heart of this case, revises the 1988 RMP and its subsequent amendments. To identify issues to be addressed in the revised RMP and EIS, BLM held formal public

---

[3] Because this opinion cites frequently to pages of the FEIS, which is broken into several separate .pdf files, the Court refers to the actual hard copy FEIS pagination. The FEIS is also located in subfolder 1.16 of Disc 3.

3

meetings in Farmington, Crownpoint, and Cuba, New Mexico; sent letters to state, county, local, and tribal governments; and used a consulting firm to conduct interviews with local residents, including rural Navajo residents.  Through these meetings, BLM identified the five principal land use and management issues it would address in the RMP revision and associated EIS.

In 2001, BLM commissioned the New Mexico Institute of Mining and Technology to work with oil and gas industry representatives to identify lessees' future demand for new gas development in the SJB, based on new state orders that allowed higher density well spacing through infill drilling.  FEIS at 2-1.  This study resulted in a Reasonably Foreseeable Development Scenario ("RFDS") which focused on subsurface development and the associated surface impact of this development in terms of wells drilled.  AR 1:18 at 6.  The RFDS predicted that, between 2002 and 2022, 9,970 new wells would be drilled in the SJB, although it noted that technological advances could reduce the number to be drilled.  Based on the RFDS, BLM prepared an EIS that described the environmental impacts of this reasonably foreseeable development within the SJB, and prepared an RMP that would purportedly balance development needs with other resource management objectives.  Because the vast majority of the oil and gas resources within the SJB were already leased, and BLM was concerned about the contractual rights of the leaseholders with respect to development, the EIS analyzed the environmental impact of the full-scale development predicted by the RFDS.

In June 2002, BLM published a draft version of its proposed RMP and EIS analyzing four alternatives, including a no-action alternative, which contained varying degrees of oil and gas leasing and development, provisions for off-highway vehicle ("OHV") use, land use adjustments, coal leasing, and protection for Specially Designated Areas ("SDAs").  The purpose

4

of the RMP amendment and FEIS was to "provide a comprehensive framework for managing the public lands and for allocating resources during the next 20 years using the principles of multiple use and sustained yield," and "to analyze the impacts of implementing existing and future land use decisions." FEIS at 1-1, 1-2. The RMP/EIS would allow up to 9,970 new gas wells on federal mineral leases in the FFO, to be drilled at a rate of approximately 500 wells per year for the next 20 years. This would constitute 50% more fluid mineral development in FFO lands than had occurred in the preceding sixty or more years.

In August 2002, after preparation of the draft RMP/EIS, the FFO held four public hearings, each preceded by informal workshops, in Farmington, Crownpoint, and Cuba, New Mexico, as well as Durango, Colorado. Public comment on the draft RMP/EIS closed in September 2002. BLM responded to the oral and written comments it received by conducting additional analyses and adding material on ozone, visibility, prevention of significant deterioration, and differing air quality impacts among the several alternatives. The final proposed RMP/FEIS was released for a 30-day protest period on April 4, 2003. On May 5, 2003, Plaintiffs filed an extensive protest of the proposed plan, which challenged virtually every element of the plan that dealt with oil and gas development and contained many of the same contentions that make up their current petition before this Court. BLM denied Plaintiffs' protest in September 2003 in a lengthy letter that attempted to address each of Plaintiffs' contentions. AR 2:100.2.

BLM received a total of 26 protest letters. Although Plaintiffs and some other groups protested that the RMP/EIS did not impose sufficient restrictions on development, many oil and gas companies and the New Mexico Oil and Gas Association protested that the RMP/EIS

5

imposed undue restrictions on companies' rights to develop their leases. AR 2:91.1, 2:92.1, 2:93.1, 2:98.1. Nineteen of the protest letters received extensive written responses from the BLM Director's Office. Of the remaining seven letters, one was withdrawn and the other six were rejected for lack of standing. None of the protests resulted in any changes to the proposed plan. On September 29, 2003, the New Mexico State Director of BLM approved the RMP, and BLM published notice of its Record of Decision ("ROD") in the Federal Register on October 9, 2003. The ROD was signed in December of 2003.[4]

The RMP/FEIS discusses four options for future development in the FFO. Its Preferred Alternative authorizes almost 27,000 acres of new surface disturbance on federal lands in the FFO area, which would bring the total area occupied by oil and gas infrastructures to 110,400 acres. It also authorizes construction of 1,000 miles of new roads, for a road density of over 3 miles of road per square mile. Also, by 2024, the Preferred Alternative could result in a net increase in emissions of over 42,000 tons per year of carbon monoxide and over 43.5 tons per year of nitrogen oxides ("NOx"). The specific management goals, objectives, and actions that comprise the Plan are contained in the description of the preferred alternative.

Significantly, no specific development activities are authorized by the revised RMP. New oil and gas wells may only be drilled in the SJB in the future if: (1) a lessee files an application for a permit to drill a well; (2) an additional site-specific environmental analysis is prepared; and (3) the government determines that the proposed activity complies with all federal, state, tribal, and local legal requirements. Any BLM decision approving a specific new well may be appealed on the basis that the activity does not comply with air, water, cultural, or other

---

[4] Throughout this opinion, for ease of citation, the Court cites to the hard copy pagination of the ROD. For record purposes, the ROD is located in subfolder 1.18 of Disc 3.

legal requirements.

## STATUTORY FRAMEWORK

### NEPA

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires

federal agencies to examine the environmental effects of proposed federal actions, and to inform

the public of the environmental concerns that went into the agency's decision-making. *See*

*Baltimore Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).  The intent

behind NEPA is to "'focus[] the agency's attention on the environmental consequences of a

proposed project,' [and] to 'guarantee[] that the relevant information will be made available to

the larger audience that may also play a role' in forming and implementing the agency's

decision," as well as to give other potentially affected governmental bodies sufficient notice of

the expected consequences so that they may be able to implement corrective measures.  *Davis v.*

*Mineta*, 302 F.3d 1104, 1114 n. 5 (10th Cir. 2002) (*quoting Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 349-350 (1989)).  NEPA's purpose is not to encourage a particular substantive

decision, but rather to "insure a fully informed and well-considered decision." *Vermont Yankee*

*Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978).  Given its

purpose, NEPA imposes only procedural requirements and does not mandate results.  *Robertson*,

490 U.S. at 350-51 (1989).  NEPA requires federal agencies to prepare an EIS for all "major

Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. §

4332(2)(C).  An EIS must describe the "environmental impact of the action; unavoidable adverse

environmental effects; alternatives to the action; relationship between the short-term uses and

long-term productivity of the affected environment; and irretrievable and irreversible

7

commitments of resources should the action be implemented." *Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (citing 42 U.S.C. § 4332(2)(C)(i)-(v)).

Under NEPA's implementing regulations, an agency must first prepare a draft EIS in which it evaluates the proposed action and its direct, indirect, and cumulative impact on the environment. 40 C.F.R. § 1508.25(c). Specifically, NEPA requires that an EIS provide "cumulative effects" analysis based on actual data. NEPA defines "cumulative effects" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." *Id.* § 1508.7. The agency must also study three types of actions in its EIS: those that are "connected," "cumulative," and "similar." *See* Id. § 1508.25(a)(1)-(3). In the draft stage, the agency must compare the proposed action to other reasonable alternatives, including taking no action at all. *Id.* § 1502.14. After a period of public comment and review, the agency responds to any comments, makes appropriate changes, and circulates a final draft of the EIS. *Id.* § 1503.4. The agency ultimately adopts a course of action by issuing an ROD.

NEPA does not require that an agency discuss every potential impact in great detail; it simply requires a reasoned evaluation of the relevant factors. *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002). Moreover, NEPA does not require that an agency elevate environmental concerns over other appropriate considerations. *See Baltimore Gas and Elec.*, 462 U.S. at 97. Instead, it "merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351. Thus, a court's review of an RMP/EIS is narrow, and the court must not substitute its judgment for that of the agency. In undertaking its

8

review, a court should employ a "rule of reason" test to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Hells Canyon Alliance v. U. S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). In reviewing the adequacy of an EIS, a court should determine whether "there is a reasonable, good faith, objective presentation of the topics," such that it "foster[s] both informed decision-making and informed public participation." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (citations and quotations omitted).

## NHPA

The National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470a *et seq*., "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation...to administer the Act." *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003) (internal quotation marks omitted). Like NEPA, the NHPA is a procedural statute rather than a substantive law. *See Friends of the Altglen-Susquehanna Trail v. Surface Transp. Bd.*, 252 F.3d 246, 252 (3d Cir. 2001). In general, the NHPA requires that a federal agency take into account any adverse effects on historical or culturally significant sites before taking action that might harm such sites. *Id.; Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). In order to accomplish this, federal agencies must engage in consultation with parties such as the State Historic Preservation Officer ("SHPO") and any potentially affected Indian tribes (a process referred to as "Section 106 consultation") to determine whether historic properties or traditional cultural properties exist in the area of the planned activity.

Under Section 106 of the NHPA, the Secretary of the Interior must consult with the

9

SHPO on "federal undertakings" that may affect historic properties.  Under this process, the Department of the Interior must identify the historic properties that may be affected, assess the historical significance of the property, determine if there will be an adverse effect to the property, consider ways to reduce or avoid such effects, and provide an opportunity for review and comment by the Advisory Council on Historic Preservation.  This process should include "background research, consultation, oral history interviews, sample field investigations, and field surveys."  36 C.F.R. § 800.4.

An Indian tribe may assume all or part of the functions of the SHPO with regard to tribal lands if, *inter alia*, the tribe designates a tribal preservation official to administer the program.  16 U.S.C. § 470a(d)(2)(B).  In such cases, the Tribal Historic Preservation Officer ("THPO") is the official representative for purposes of Section 106 consultation.  36 C.F.R. §§ 800.2(c)(2)(i)(A); 800.3(c)(1).  Consultation with an Indian tribe must recognize the government-to-government relationship between the federal government and the tribe, and the consultation should be conducted in a manner "sensitive to the concerns and needs of the Indian tribe . . ."  36 C.F.R. § 800.2(c)(2)(ii).  Consultation should provide the tribe with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id.*  Tribal consultation should be conducted concurrently with NEPA analyses, as historic and cultural resources are expressly included among the factors to be considered in an EIS.  36 C.F.R. § 800.8.

## FLPMA

The Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701
*et seq.*, sets forth standards for BLM's management of "public lands," which are lands owned by
the United States and administered by the Secretary of the Interior through BLM.  The FLPMA
establishes a policy of "multiple use" land management.  It "provide[s] guidance and a
comprehensive statement of congressional policies concerning the management of the public
lands." *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 737 (10th Cir. 1982).  The
FLPMA directs the government to manage public lands for multiple uses and sustained yield.  43
U.S.C. § 1732(a).  Under the FLPMA, "Congress provided that BLM should manage the public
lands by using the Act's procedures in a dynamic, evolving manner to accommodate these
competing demands." *Rocky Mountain*, 696 F.2d at 738.  "Multiple use" is defined as the
utilization of various resources (recreation, range, timber, mineral extraction, watershed, wildlife
and fish, and scenic, scientific, and historical values) in the combination that will best meet the
present and future needs of the American people.  43 U.S.C. § 1702(c).  "Sustained yield" is
defined as managing to maintain regular renewable resource outputs in perpetuity.  *Id.* at §
1702(h).  In addition to the incorporating the concepts of multiple use and sustained yield in its
management decisions, the FLPMA also requires BLM to "take any action necessary to prevent
unnecessary or undue degradation of the lands." *Id.* at § 1732(b).

Thus, under the FLPMA, a federal agency need not permit all resource uses on a given
parcel of land, if it would be inappropriate to do so. *Rocky Mountain*, 696 F.2d at 738.  Under the
"multiple use" concept, BLM conducts inventories of public lands and incorporates those
inventories into resource management decisions.  The inventories must "be kept current so as to
reflect changes in conditions and to identify new and emerging resources and other values.  43

11

U.S.C. § 1711(a). The multiple use concept is reflected in the agency's RMP, which addresses

such issues as (1) land areas for limited, restricted, or exclusive use; (2) allowable resource uses

and related levels of production or use; (3) resource condition goals and objectives to be

attained; (4) need for an area to be covered by more detailed and specific plans; (5) support

action, including such measures as resource protection and access development necessary to

achieve the objectives. 43 C.F.R. § 1601.0-5(k)(1)-(3), (5)-(6).

RMPs must "provide for compliance with applicable State and Federal air, water, noise,

and other pollution standards or implementation plans." 43 U.S.C. § 1712(c). In addition, when

developing and revising land use plans, the FLPMA requires BLM to give priority to the

designation and protection of areas of critical environmental concern ("ACECs"). 43 U.S.C.

1712(c)(3). ACECs are "areas within the public lands where special management attention is

required (when such areas are developed or used or where no development is required) to protect

and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife

resources or other natural systems or processes[.]" 43 U.S.C. § 1702(a). Actions taken on BLM

land and approved by BLM must conform to the RMP that governs the area at issue. *Id.* at §

1610.5-3(a). However, an RMP is not a final implementation decision on actions which require

further site-specific plans or decisions.

## STANDARD OF REVIEW

Review of a federal agency's compliance with NEPA and the FLPMA is accomplished

subject to the judicial review provisions of the Administrative Procedures Act, 5 U.S.C. § 701 *et*

*seq.*, and is limited to the administrative record.[5] *See Silverton Snowmobile Club v. U.S. Forest*

---

[5] The parties have assumed that the APA is the source of judicial review for all three
statutes at issue in this case. However, there is conflicting authority over whether a direct right of

*Serv.*, 433 F.3d 772, 779-80 (10th Cir. 2006).  Under this standard, the ROD and RMP/FEIS

must be set aside if they are "arbitrary and capricious, an abuse of discretion, or otherwise not in

accordance with law" or "without observance of the procedure required by law."  5 U.S.C. §§

706(2)(A), (D).  Under this standard, the Court must undertake a "thorough, probing, in-depth

review" of an agency's actions in order to determine whether its decision was "based on a

consideration of the relevant factors and whether there has been a clear error of judgment."

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 416 (1971).  "An agency action

is arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or [if the decision] is so implausible that it could not be ascribed to a difference in view

or the product of agency expertise." *Utah Envtl. Congress v. Richmond*, 483 F.3d 1127 (10th

Cir. 2007) (internal quotations omitted).  Concerning review under NEPA,  "so long as the

record demonstrates that the agencies in question followed the NEPA procedures, which require

agencies to take a 'hard look' at the environmental consequences of the proposed action, the

court will not second-guess the wisdom of the ultimate decision." *Id.* at 1163 (citing *Robertson*,

490 U.S. at 350).  Simply put, a court may not substitute its judgment for that of the agency.

*Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1050 (10th Cir. 1998).

## DISCUSSION

1.   NEPA

_____

action exists under NHPA.  *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1098
(9th Cir. 2005) (holding no private right of action exists under Section 106 of NHPA); *Boarhead
Corp. v. Erickson*, 923 F.2d 1011, 1017 (3d Cir. 1991) (holding such a private right of action
does exist).  Because it does not appear the standard of review would be altered whether the
review is conducted under the APA or directly under the NHPA, the Court does not address the
question of APA review versus direct review.

a. Analysis of full range of reasonable alternatives

BLM prepared its revised RMP to guide its management of public lands in the SJB for the next twenty years, and to update the management restraints on oil and gas development. Plaintiffs contend that Defendants violated NEPA because they did not consider reasonable development alternatives as required by the statute. NEPA Section 102(c), 42 U.S.C. §4332 (2005), requires that federal agencies consider alternatives to a proposed federal action. The associated regulations also state that agencies "shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R §1502.1. The discussion of potential alternatives is the "heart" of an environmental impact statement. 40 C.F.R. §1502.14. This discussion should cover "the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id. BLM's analysis met these requirements.

1. RMP's Purpose and Need

Plaintiffs argue that BLM's "Statement of Purpose and Need" in its RMP/FEIS was so broad that their consideration of only a narrow range of alternatives violated NEPA. They contend that BLM did not meet its duty to consider a sufficient range of alternatives because it analyzed only three action alternatives that were virtually indistinguishable with regard to allowable oil and gas development. They argue that each alternative allowed development of the Farmington oil and gas resources up to the maximum infill drilling permitted under New Mexico's well-spacing law, each was designed to allow drilling of 500-600 new wells each year, and each would generate similar environmental impacts. Thus, Plaintiffs claim that instead of

considering a range of alternatives, BLM considered the same development scenario disguised as three minimally different alternatives in order to reach a pre-determined result designed to maximize new oil and gas development. They argue that BLM's analysis did not include reasonable alternatives that would not have increased the surface disturbance of the land or that would have limited new gas development and spacing of wells to levels below the maximum densities allowed by New Mexico law. They also argue that it is too difficult to determine how the Preferred Alternative was chosen over the other alternatives evaluated, including the No Action Alternative, because BLM does not provide information regarding the need for increased oil and gas production or land use management revisions.

Plaintiffs further claim that BLM failed to consider other alternatives raised in the comment period, including alternatives suggested by other agencies. These alternatives include one that would prohibit a net increase in surface disturbance by precluding further habitat fragmentation in wildlife management areas by limiting well pad, road, and pipeline construction. They argue that BLM's rationale for failing to consider this alternative impermissibly gave excessive weight to oil and gas lease rights rather than following the demands of NEPA to analyze what environmental impacts would result from varied levels of development.

Determination of which alternatives are to be studied is generally a matter left to the discretion of the agency. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council*, 435 U.S. 519, 551-552 (1978). The EIS's "Purpose and Need" section briefly defines the underlying purpose and need to which the agency is responding in proposing its range of alternatives, including the proposed action. This statement of a project's goals necessarily

dictates the range of reasonable alternatives. *See Fuel Safe Washington v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004); *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999). When considering if an agency sufficiently looked at all reasonable alternatives, "courts look closely at the objectives identified in an EIS's purpose and needs statement." *Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002). Refusal to propose or consider an alternative that does not meet the proposal's goals is not arbitrary or capricious. *See Fuel Safe Washington,* 389 F.3d at 1323-27; *Citizens' Comm. to Save our Canyons*, 297 F.3d at 1031.

In designing the purpose and need of its EIS that guides its consideration of alternatives, an agency need not "elevate environmental concerns over other valid concerns." *Utahns for Better Transp. v. DOT*, 305 F.3d 1152, 1162-63 (10th Cir. 2002). For instance, in *Colorado Environmental Coalition,* the purpose and need of the EIS considered in that case concentrated on additional winter recreational development in the area. Because the EIS had the purpose of studying additional development, the court held that the range of alternatives discussed, each of which assumed development and which did not include a conservation alternative, was not impermissibly narrow. 185 F.3d at 1175. It noted that the agency could not consider its actions "in a vacuum," and that the agency was thus "fully authorized within this decision-making context to limit its consideration to expansion alternatives designed to substantially meet...recreation development objectives." *Id.*

### 2. BLM considered alternatives that were not overly narrow

The alternatives that BLM considered in this case properly followed the stated purpose and need of the EIS and were not overly narrow. BLM prepared the RMP to "provide a

16

comprehensive framework for managing the public lands and for allocating resources during the next 20 years using the principles of multiple use and sustained yield." FEIS at 1.  The primary purpose of the corresponding EIS was to "analyze the impacts of implementing existing and future land use decisions," and to "analyze and document the direct, indirect, and cumulative impacts of . . . reasonably foreseeable future actions resulting from federally authorized fluid mineral activities." *Id.* at 1-2.  BLM decided to revise its RMP because the 1988 "RMP and amendments are no longer adequate to address current demands on public lands and resources." FRMP at 1-1.[6]  Those "demands" related to several issues, including oil and gas development. Nearly all of the minerals on federal land within the SJB were already subject to existing leases when this RMP process began, with many of the leases dating back over 50 years.  FEIS at 1-1; 2-247.  Once issued, these leases are "held by production" (meaning that the leases expire once production ceases), and leaseholders "are required by federal regulation to diligently develop and efficiently extract the resources covered by their lease." *Id.* at 2-247; 43 C.F.R. § 3160.0-4 (objective of regulations governing oil and gas operations on public lands is "to promote the orderly and efficient exploration, development, and production of oil and gas.").  These regulations also allow operators to drill and produce other wells as long as the drilling and production conform to the applicable well-spacing laws and other applicable laws.  43 C.F.R. § 3162.2-1.  Essentially, BLM concluded that the leaseholders have paid the government for the right to extract minerals covered by those leases, and the government has entered into contracts to permit leaseholders to develop the resources.  FEIS at 2-247.  This conclusion did not mean that development could occur in violation of other laws, but it did mean that oil and gas

---

[6] "FRMP" refers to the Farmington RMP released along with the ROD in December 2003.  It is also found in folder 1.18 on Disk 3.

development of leased land was a reasonable land management purpose.

With these needs in mind, BLM commissioned a study conducted by the New Mexico Institute of Mining and Technology to identify reasonable foreseeable demand for oil and gas development in the SJB. This study resulted in a reasonably foreseeable development scenario ("RFDS"), which forms the basis for the projected oil and gas development in the planning area over the next 20 years. FEIS at 2-1 to 2-2. The RMP declared that the projected additional development would help "to meet the United States' growing energy needs while reducing the nation's dependence on foreign sources" and would "protect[] the financial interest of the U.S. by ensuring efficient drainage of federal minerals." *Id.* at 1-1. Because the projected numbers of new wells on federal surface would "exceed the levels analyzed in the NEPA analysis for the 1991 amendment," BLM found it necessary to conduct additional the analysis found in the FEIS. FRMP at 1-1.

In addition to oil and gas development, BLM identified and studied four other primary land use management needs: (i) "increased . . . demand to make land available for urban expansion or public purposes in the tri-city area of Farmington, Bloomfield, and Aztec" due to population growth; (ii) increased demand for "OHV [off-highway vehicle] use on public lands along with concerns that OHV designations established in the 1988 RMP are no longer appropriate to protect public resources"; (iii) lands requiring additional "special protection" as SDAs, including ACECs; and (iv) "interest in leasing coal in areas that have not been analyzed in previous plans." FRMP at 1-1 to 1-2. These were also taken into account in the FEIS.

These priorities set out in BLM's statement of Purpose and Need guided the range of alternatives that it considered. BLM considered in extensive detail the alternatives that it

18

believed would satisfy the FEIS's Purpose and Need. FEIS at 2-29 to 2-249. It eliminated seven

additional alternatives from further analysis, giving reasons for why it believed they would not

satisfy the requirements. FEIS at 2-247 to 2-249. Alternative A, the no-action alternative,

would allow management to continue under the then-existing RMP documents and policies.

Alternative B set maximum recovery of hydrocarbon resources as the primary goal, and also

maximized other public uses of the land. Alternative C emphasized conservation, protection,

and enhancement of natural and cultural resources through special management of designated

areas. Finally, Alternative D, the preferred alternative, balanced the two goals to achieve

maximum practicable recovery of oil and gas, while also maximizing protection of the most

sensitive environmental resources. *See* ROD at 9-10.

Plaintiffs contend that BLM's range of alternatives was too narrow in that they all

allowed some drilling of wells, and because, according to plaintiffs, BLM failed to consider the

alternative of no net increase in surface disturbance. Plaintiff's Petition, Doc. 29 at 13. This

contention fails when the purpose of the RMP is considered. The number of new wells BLM

contemplated ranged from 4,421 under Alternative A to 13,275 under Alternative B. AR 2:100.2

at 2 (BLM letter responding to Protest of FEIS filed by The Land and Water Fund of the

Rockies). Alternatives C and D resulted in a predicted 9,836 and 9,942 wells respectively. ROD

at 10. Although the number of wells is roughly the same in two of the four alternatives, the

amount of surface disturbance under each alternative varies significantly. FEIS at 4-5. For

instance, Alternative A limits OHV use on only 122,000 acres, while the other alternatives

limited such use on approximately 1.35 million acres. AR 2:100.2 at 2. Thus, the action

alternatives provided far greater protection from OHV use than the no-action alternative.

19

Alternative C proposed applying No Surface Occupancy stipulations to 55,070 acres while

Alternative A proposed the same stipulation on only 13,137 acres. *Id.* Similarly, Alternative C

would have imposed oil and gas timing stipulations on 443,235 more acres than the no-action

alternative (Alternative A). *Id.* The record also contains numerous other significant differences

in surface disturbance among the alternatives.

As it developed and analyzed its range of alternatives, BLM considered its existing

management situation, including that more than 99 percent of the federal oil and gas resources in

the high development area had already been leased, that nearly all of those leases were in

production, and that it believed lessees had the legal right to develop their leases. ROD at 10.

Public comments on the Draft RMP suggested an alternative that would allow no new or net

increase in surface disturbance. BLM rejected such alternatives that "would prevent the orderly

development and drainage of gas" because it "could lead to a violation of correlative rights," and

would be "inconsistent with the purpose and need of the FEIS."[7] AR 2:100.2 at 2. BLM

rejected Alternative A because it "would not accomplish the objectives of the National Energy

Policy and would not meet the purpose and need as well as Alternative D." ROD at 10. In

addition, it "does not provide for the orderly development of important energy resources as

directed by the Energy Policy Conservation Act (APCA) and EO 13212" and would result "in

---

[7] Plaintiffs cite the analysis in *N. Plains Res. Council v. BLM*, Civ. No. 03-69, 2005 U.S. Dist. LEXIS 4678 (D. Mont. Feb. 25, 2005) for the proposition that concerns over lessees' investment-backed expectations should not limit the range of alternatives considered. The purpose and need of the EIS considered in *Northern Plains*, however, was to "minimize the environmental and societal impacts related to CBM [coal bed methane] activities." 2005 U.S. Dist. LEXIS 4678 at *20. Thus, the court found that BLM should have considered a proposed phased development alternative, because it was consistent with the EIS's purpose and need. In this case, the purpose and need of the FEIS is decidedly not to minimize environmental impacts. Of course, the Court is not suggesting that the leases entered into by the Government would ever excuse BLM from complying with environmental or other requirements.

financial loss to the public due to drainage of adjacent federal resources." *Id.* at 11.  BLM

rejected Alternative B because "it proposed a 33 to 35 percent greater amount of long term

surface disturbance when compared to Alternatives C and D" with only minimal additional

production.  *Id.*  It rejected Alternative C because the level of surface restrictions proposed might

unduly restrict access.  *Id.*  Finally, BLM adopted Alternative D "because it supports the

development of oil and gas resources while providing a framework which encourages use of new

technology and use of mitigation measures to minimize or avoid impacts to resources or land

uses from oil and gas activities and prevent unnecessary or undue degradation."  *Id.*

 Plaintiffs' claim that BLM should have considered an alternative that would have

prohibited  a net increase in surface disturbance by precluding further habitat fragmentation in

wildlife management areas also fails.  BLM rejected this alternative for several reasons.  It noted

that the comments raising this alternative failed to present site-specific data indicating which

wildlife populations may benefit, due to reduced habitat fragmentation, from this alternative, and

that there are virtually no pristine wildlife habitats or large blocks of unfragmented habitat in the

Farmington Field Office area.  BLM also noted that in order to protect natural and cultural

resources, it has developed stipulations, best management practices, and constraints, such as in

timing.  It also noted that such an alternative would run counter to the National Energy Policy

and could lead to a violation of lessee's rights, requiring compensation from the government.

FEIS at 2-247.  This listing of its reasons easily satisfies NEPA's requirement to "briefly discuss

the reasons" for having eliminated an alternative, as required by 40 C.F.R. § 1502.14(a).

 In their petition, Plaintiffs contended that BLM was required to analyze reasonable

alternatives to full-field development of coal bed methane ("CBM") resources because it had not

done so in any existing, pre-mineral lease NEPA document.   At oral argument held on

Plaintiffs' Petition for Review of Agency Action held on October 9, 2007, Plaintiffs dropped this

claim. *See* Transcript at p. 20.

> b.   "Hard look" at air quality impacts

In *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), the Supreme

Court noted that NEPA does not require a particular substantive outcome; rather, what the policy

goals of the law require is that agencies take a "hard look at [the] environmental consequences"

of their proposed actions.   Plaintiffs challenge BLM's "hard look" at air effects on three

grounds.   They claim that BLM: (1) failed to consider whether the proposed action would cause

air pollution in the SJB to exceed federal standards under the Prevention of Significant

Deterioration ("PSD") program; (2) failed to consider the effect of additional oil and gas

development on ozone; and (3) relied on inadequate pollution mitigation measures.

> 1. Whether BLM failed to consider PSD standards

The RMP/EIS reflects the collective efforts of not only BLM, but also the Environmental

Protection Agency ("EPA"), the New Mexico Environment Department ("NMED"), the U.S.

Forest Service, the Bureau of Reclamation, and wide-ranging views of the public.   It comprises

over 1,000 pages of data and analysis.   BLM devoted significant attention to air effects in

preparing its RMP/FEIS, with hundreds of pages of technical analysis.[8]   BLM's air quality

analysis included an evaluation of near- and far-field pollutant impacts using dispersion

modeling.   FEIS at 4-16.   In conducting its study, BLM took a conservative approach in the

assumptions that it used, such as assuming continuous operation of production sources, no

---

[8] Of course, the length of analysis alone does not provide an indication of its quality or
whether it addresses the required elements.

mitigation measures on compressors, and no technological improvements over the twenty-year life of the projected development. FEIS at 4-58 to 4-70. For near-field impacts, because it could not know the exact locations of operational emission sources ahead of receiving actual applications to drill, BLM and its modeling contractor SAIC created a conservative scenario that would produce an upper bound of impacts that could be expected to occur from any combination of proposed sources within the planning area. FEIS at 4-60. BLM's high density module analysis determined that impacts from proposed operation emissions sources would decrease rapidly with distance from the sources, and therefore, that distant emissions sources would not substantially contribute to near-field impacts analyzed for the project emissions module. *Id.*

In order to predict criteria pollutants, BLM and its air resource experts relied on an EPA Guideline model recommended by the New Mexico Air Quality Bureau ("NMAQB"), and coordinated its modeling with NMAQB prior to conducting its analysis. AR 2:74.1 at 7; FEIS at P-13. Following publication of the Draft RMP/EIS, BLM and SAIC responded to comments from the EPA and NMAQB by preparing additional modeling and descriptions of impacts related to terrain, ozone concentrations, and PSD increments using methodologies approved by those agencies in advance. FEIS at P-28.

Plaintiffs argue that BLM failed to analyze and disclose whether the project will cause the increments of oxides of nitrogen, particulate matter, and other air pollutants to exceed federal standards under the Prevention of Significant Deterioration ("PSD") program, and that BLM instead simply reached the vague conclusion that the impacts on regional PSD compliance and visibility are "potentially significant." *Id.* at 4-63, 4-67, and 4-68 to 69.

As an initial matter, it is not clear to the Court that NEPA requires an agency to address

23

future compliance with the federal PSD program or performance of a PSD increment analysis when compiling a programmatic EIS. Significantly, PSD compliance would be required before any new activity could occur. Because the RMP/EIS does not actually authorize any oil and gas development, any proposed project would be subject to additional analysis of possible air effects before approval. When a well is proposed for development, a site-specific analysis must be done as part of the permitting process to determine the specific impact of the project. *Id.* at P-27. No development of a new or modified source of air pollutants would be allowed to proceed unless it could be demonstrated by modeling that the source would not cause an exceedance of any state or federal ambient air standard, including PSD increments. *Id.* at P-23. Moreover, BLM stressed throughout the RMP/EIS and ROD that "[a]ll air pollutant emissions from future federally conducted or approved activities under the Farmington RMP shall comply with all applicable local, state, tribal, and federal air quality laws, statutes, regulations, standards, and implementation plans." ROD at 13.

Regardless, the Court finds that BLM did not fail to adequately consider PSD increment consumption. The FEIS qualitatively addressed PSD Class I increment consumption and visibility impacts for Alternatives A, C and D by reference to the impact analysis performed for Alternative B. BLM and SAIC evaluated possible effects by preparing both a quantitative analysis to estimate impacts to PSD $NO_2$ increment levels and a qualitative analysis to estimate visibility levels. FEIS at 4-66 to 4-69. For its PSD increment analysis, BLM relied on the same emissions model analyzed for project near-field impacts and found the "impacts would not be expected to contribute to an exceedance of the PSD Class I increment of $NO_2$." *Id.* at 4-67. It also did an analysis of the amount of PSD increment that would be consumed from a typical

24

worst-case cluster of proposed emissions. *Id.* This analysis was sufficient.

### 2. Whether BLM failed to consider the effect of development on ozone

Plaintiffs also argue that BLM failed to analyze how the new gas development authorized by the RMP/FEIS will further contribute to the SJB's ground-level ozone problem, and how the increase in ozone will affect public health. Plaintiffs contend that since at least April 2002, federal and state agencies have grown increasingly alarmed that ground-level ozone, also known as "smog," in the SJB may soon exceed standards set in the Clean Air Act ("CAA"). They allege that the two primary contributors to ozone in the SJB are electric power generation plants and the oil and gas industry (although the NMAQB apparently believes that urban/suburban vehicle emissions and local power generation plants play the primary role in ozone generation, rather than oil and gas development). AR 2:74.2. The draft RMP/EIS issued in June 2002 did not acknowledge ozone as a potential impact. Plaintiffs attribute this to BLM's "flawed" decision to limit the air analysis to a single development module instead of taking a hard look at the overall air impacts associated with all new development authorized by the RMP/FEIS. According to Plaintiffs, the additions to the final RMP/FEIS did not correct the deficiencies in the draft, but simply added a vague new section to the document that broadly concluded that "the projected development shows that [the plan] would substantially increase emissions from current levels . . . As a result, emissions from projected development would be expected to increase ambient [ozone] levels in the planning area by an unspecified amount." FEIS at 4-69. Plaintiffs contend that BLM was obligated to obtain more detailed information about air impacts because the information is relevant to reasonably foreseeable impacts, is essential to a reasoned choice among alternatives, and the overall cost of obtaining more detailed information is not exorbitant.

Plaintiffs also contend that NEPA demands a more precise discussion and consideration of ozone and public health concerns, and that BLM failed to give the issue the "hard look" that the statute demands.

Interestingly, ozone was not raised as an issue during the scoping on the EIS, and it was not until shortly after BLM finished the Draft RMP/EIS in June 2002 that it learned from the NMED that ambient air quality levels appeared to be approaching the newly implemented federally mandated eight-hour ozone standard.  Once informed of the potential ozone issue, BLM worked with the EPA and NMAQB to determine what additional analysis and mitigation proposals would be required for the Final EIS.  *See* AR 2:74 at 17, 2:74.16 at 23.  At the EPA's suggestion, BLM agreed to add analysis to the FEIS to "[p]rovide a more qualitative analysis of the impact of project emissions on ambient ozone levels." AR 2:74.16 at 23.  Although the EPA indicated that it also believed  that photochemical modeling was necessary to ensure that the ozone quality standards would be protected, it recognized that much of the data necessary for such modeling was not currently available.  AR 2:74.18.  BLM and the EPA therefore agreed that BLM would work with NMAQB and the Four Corners Ozone Task Force to establish monitoring studies to gather the necessary data.  AR 2:74.19.  BLM would then use data from those monitoring studies to project changes to ozone levels based on likely rates of oil and gas field development.  BLM agreed to impose mitigation measures to reduce ozone precursors if the results of those studies indicated a potential problem.  *Id.*

Through the work of the Ozone Task Force in which BLM participated, the NMED and local governments entered into an Early Action Compact ("EAC") with the EPA.  An EAC is a preemptive approach to planning to ensure that an area continues to comply with the national 1-

and 8-hour ozone standard." AR 2:100.2 at 14.  The EAC process consisted of studying ozone

formation in the region, identifying control measures to assist in complying with the ozone

standard, and incorporating those studies and control measures into a Clean Air Action Plan

("CAAP") submitted by the EAC to the EPA. *Id.*  It was these control measures proposed by the

EAC in the CAAP  that BLM committed to using "as the basis for air quality mitigation."  ROD

at 13.  BLM included its additional qualitative analysis on ozone in its Final RMP/EIS.  FEIS 4-

69, 4-70, 4-124.  BLM also detailed its additions to the FEIS in its Response to one of Plaintiffs'

Protests.  AR 2:100.2 at 13-14.

The EAC air quality studies, including photochemical modeling, were finally completed

in January 2004, just after the release of the ROD, and the EAC released its CAAP to the EPA in

March 2004.  *See* AR 3:123.3 (air quality monitoring analysis for San Juan Early Action Ozone

Compact).  Surprisingly, given the prediction in the FEIS that projected development would

substantially increase emissions from current levels, the results of the EAC modeling indicated

"that San Juan County is expected to remain in attainment of the 8-hour ozone standard through

2007 by a substantial margin." *Id.* at 10.  Indeed, even "[i]f the estimated year 2012 development

of the San Juan Basin oil and gas field is accelerated to actually occur [by 2007], the modeled

impact on 8-hour concentrations is expected to be insignificant." *Id.*  Although it is outside the

record of factors considered by BLM in completing its RMP/FEIS, given Plaintiffs' attacks on

BLM's methodology, it is worth noting that the EPA concurred with the CAAP's underlying

modeling and conclusions in a proposed rule.  *See* 70 Fed. Reg. 23,075, 23,076 (May 4, 2005)

("study meets EPA's modeling requirements" and projects the area will be "well below the 8-

hour ozone limit").  Given BLM's analysis of ozone once it became an issue, its coordination

27

with other agencies to study the issue further and to develop a strategy to obtain further data, its follow-up once it got that data, its commitment to measures to mitigate ozone, and the fact that the conservative assumptions in the FEIS model resulted in a predicted ozone level far exceeding the actual level, the Court cannot say that BLM's NEPA analysis on this topic was arbitrary and capricious.

### 3. Whether BLM relied on inadequate mitigation measures

Finally, Plaintiffs argue that BLM improperly relied upon speculative mitigation measures to hide the true air quality impacts of oil and gas development in the SJB. They contend that the FEIS provides essentially no discussion of how BLM intends to mitigate the significant air pollution from new gas development, but that it instead merely refers vaguely to various technologies for minimizing emissions without any qualitative or quantitative discussion of their effects. They claim that this perfunctory description of controls as a form of mitigation, without supporting analytical data regarding their efficacy, violates NEPA's requirement that BLM take a "hard look" at how possible mitigation measures will effect air pollution.

NEPA requires an agency to discuss possible mitigation measures designed to avoid adverse environmental impacts. 42 U.S.C. § 4332(C)(ii); 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.25(b)(3). The discussion must be "reasonably complete" in order to "properly evaluate the severity of the adverse effects," and the agency may not merely list potential mitigation measures. *Colorado Environmental Coalition*, 185 F.3d at 1173. The FEIS contains an extensive discussion of mitigation measures for all manner of environmental resources, including soil, water, vegetation, wetlands, wildlife, special status species, rangeland, cultural resources, paleontology, noise, and roads. *See* RMP/EIS at 4-130 to 4-137. Plaintiffs' claim

focuses solely on those mitigation proposals directed toward air quality.  These are discussed in the ROD at 13-15, and in the Final RMP at 2-22 to 2-23.

BLM's discussion of mitigation measures related to air quality is, indeed, somewhat thin. Nonetheless, the Court finds that it is adequate to meet the statutory requirements imposed by NEPA.  The measures laid out in the ROD and FEIS are well-defined, substantive steps that the agency plans to take to address air pollution, based on contemporaneous analysis, and steps to be implemented in the future if warranted by the results of ongoing monitoring.  The initial mitigation steps discussed include well-spacing limitations on new oil and gas facilities and strict emissions controls on both wellhead and pipeline compressors, a major source of air pollution.  The well-spacing limitations on new construction are specific (construction limited to four wells within one square mile, with each well no closer than one-half mile to another).  FEIS at 2-22.  The imposed emissions controls are also quite specific (new and replacement wellhead compressors must limit their NOx emissions to less than 10 grams per horsepower-hour, while each new pipeline compressor must limit its total NOx emissions to less than 1.5 grams per horsepower-hour).  *Id.*  These requirements are not speculative, as claimed by Plaintiffs, but rather are mandatory if more significant mitigation measures pursuant to the CAAP are not in place by July 1, 2004.  Nor did BLM avoid any discussion of the likely qualitative effects of the measures.  *See id.* (measure intended to substantially reduce ozone, and implementation would also eliminate predicted significant near-field 24-hour nitrogen dioxide impacts).

As indicated in the ROD, BLM will continue to support the San Juan EAC and follow future CAAP emission control measures that are more stringent than the proposed mitigation standards.  Further, as the Ozone Task Force makes specific recommendations, BLM will

incorporate those as mitigation measures under 43 C.F.R. § 3162.1. BLM will also perform further specific air quality tests as part of an EIS for another potential project, and will incorporate those results to determine if further mitigation components are needed. *Id.* Additionally, as pointed out on page 13 of the ROD, BLM can engage in further mitigation opportunities at the leasing stage through the application of lease stipulations.

Further discussion providing context for the mitigation measures, such as an indication of current emissions per horsepower-hour and a quantitative estimate of how much pollution could be avoided by following the mitigation measures would have been helpful to those evaluating the measures' sufficiency. However, the discussion of mitigation measures and the qualitative analysis of their likely results is far greater than the "mere listing" of measures found inadequate in *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998) or the "perfunctory description" found lacking in *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998), two cases cited by Plaintiffs. In fact, BLM's discussion of the measures appears to exceed the one approved in *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468 (9th Cir. 2000), where the court found to be sufficient a bullet point list of measures to be undertaken if water quality standards are not met, although the measures were "stated in somewhat general terms" and discussed without supporting documentation as to their effectiveness, reliability, cost, or feasibility. *Id.* at 476. The court found that, because the actual adverse effects of future development are uncertain, as long as the EIS considered the potential effects and set up mitigation processes to be followed if specific quality targets are not met, the discussion was sufficient. For similar reasons, BLM's discussion in this case was sufficient as well.

c. Preparation of a single EIS

In their petition, Plaintiffs argued that BLM was required to expand the scope of its EIS

to include the effects of all oil and gas development throughout the entire SJB. At oral argument

held on Plaintiffs' Petition for Review of Agency Action held on October 9, 2007, Plaintiffs

dropped this claim. *See* Transcript at p. 19.

2.    NHPA

Plaintiffs assert that Defendants violated NHPA while preparing the RMP/FEIS by failing

to consult adequately with Indian tribes to identify and protect properties of traditional spiritual

and cultural importance. Plaintiffs contend that certain resource allocation decisions in the RMP,

such as those authorizing new gas development and designating cultural resources as ACECs,

qualify as an undertaking that "has the potential to cause effects on historic properties" under 36

C.F.R. § 800.3(a). Under NHPA regulations, BLM's plan triggers NHPA Section 106

consultation requirements if those activities "restrict the subsequent consideration of alternatives

to avoid, minimize, or mitigate" adverse effects on historic properties. *Id.* at § 800.1(c).

Plaintiffs argue that the RMP meets this test because its land management decisions will restrict

BLM's ability to condition or deny future development proposals affecting historic properties and

traditional cultural properties, and that tribal consultation must be an integral part of the

identification and designation process. The Court agrees with Plaintiffs that BLM's preparation

of its RMP/FEIS triggers Section 106 consultation requirements. However, Plaintiffs' NHPA

claim fails because BLM engaged in the requisite consultation.

NHPA regulations require that "the agency official make a reasonable and good faith

effort to identify Indian tribes...that shall be consulted in the section 106 process." 36 C.F.R. §

800.2(c)(2)(ii)(A). Prior to preparing the RMP/FEIS, BLM sent letters to 51 different tribal governments and 29 other tribal officials to inform them of the project and to seek their input on concerns and issues BLM should consider during the planning process. RMP at 5-1. Recipients of those letters included 19 Pueblos, 29 Navajo Chapters, the Navajo Nation, the Jicarilla Apache, the Southern Ute, and Ute Mountain Tribes. ROD at 8. BLM also sent letters to 24 tribes and 27 Navajo Chapters in an attempt to identify Traditional Cultural Properties ("TCPs") that might be known to Native Americans but not to others. FRMP at 1-16. BLM sent copies of the draft RMP and EIS as well as the proposed RMP and Final EIS to all tribal entities that requested copies.

In addition to sending out these letters and drafts, BLM hired a sociological consulting firm early in the process to conduct personal interviews with rural residents, particularly Navajos, on potential issues with the RMP. ROD at 8. Further, the record demonstrates that BLM also engaged in numerous meetings with the Navajo Nation, various Navajo Chapters, and individual members. Despite these efforts, Plaintiffs claim that BLM failed to meet the requirements of the NHPA in three ways: 1) failure to consult with three Navajo Chapters; 2) failure to sufficiently consult with the Navajo Nation; and 3) failure to adequately protect cultural, historic, and sacred sites.

Plaintiffs contend that "BLM entirely failed to consult with the Eastern Navajo Counsel and Counselor, Pueblo Pintado, and Huerfano Chapters." Plaintiff's Petition, Doc. 29 at 34. This This claim is belied by the record, which demonstrates that BLM attended meetings at all three Chapter Houses. *See* AR 2:108.9 at 1, 2:108.13 at 2, 2:108.20. More significantly, the NHPA does not requires BLM to consult with every individual tribal chapter. Instead, it requires that the government consult with the Tribal Historic Preservation Officer, who is the official representative for Section 106 consultation purposes according to 36 C.F.R. §§

32

800.2(c)(2)(i)(A); 800.3(c)(1). The Navajo Nation's Code cited by Plaintiffs in their Petition, Doc. 29 at 33-34, which Plaintiffs suggest qualifies the Chapters as "tribes" for NHPA purposes, does not change this conclusion because the NHPA specifies the Tribal Historic Preservation Officer is the representative designated by the statute.[9] Plaintiffs' case citations in its *Notice of Supplemental Authority* [Doc. 70] fail to help Plaintiffs' claim either. Simply because BLM chose to consult with individual Navajo Chapters in other cases does not demonstrate that it was legally obligated to consult all Chapters in all situations.

Plaintiffs contention that BLM failed to consult adequately with the Navajo Nation fails as well. As an initial matter, it is questionable, at best, whether Plaintiffs can assert rights on behalf of the Navajo Nation. The Court notes that the Navajo Nation declined to be a plaintiff in this action and expressed a desire not to be a "bottleneck" in the implementation of the RMP. AR 2:108 at 59. As stated by the court in *National Indian Youth Council v. Andrus*, 501 F. Supp. 649, 684 (D. N.M. 1980), if the Court were to entertain Plaintiffs' claim on behalf of the Navajo Nation, "the Court would, in effect, be allowing Plaintiffs to disregard the Tribe's right to be the final arbiter and, thereby, the final spokesman for intra-tribal affairs through a procedure characterized by one court as a 'back door method of...attempting to represent the tribe without approval or authority.'" Doing so would violate the regulatory requirement to recognize the tribe as a sovereign authority. 36 C.F.R. § 800.2(c)(2)(ii).

Even if Plaintiffs could somehow assert claims on behalf of the Navajo Nation that it was improperly consulted, the record demonstrates that BLM's consultations satisfied the NHPA.

---

[9] The Court notes that, in its brief in Response to Plaintiffs' Petition [Doc. 42], the Southern Ute Tribe states that the sections of the Navajo Nation's Code cited by Plaintiffs concerning the power of Chapters to address land use planning were repealed by the Navajo Nation Council in 1998. Because the Court does not believe that consultation with all individual Chapters is mandatory under the NHPA, it need not resolve whether the Code sections cited by Plaintiffs are still current Navajo law.

BLM's State Director had a face-to-face meeting with the President of the Navajo Nation. AR 2:108 at 59-60. BLM officials met with representatives from the Navajo Nation's Departments of Minerals, Land, Historic Preservation, Agriculture, and Natural Resources. *Id.* at 66, AR 1:33.9. These face-to-face meetings were supplemented by extensive correspondence between BLM and the Navajo Nation's President and other Navajo Nation Departments. AR 2:108.6, 108.7, 108 at 51-55, 59-60, and 63-70. *See also* AR 2:108.26 (summary of a telephone call between BLM and the Navajo Justice Department detailing tribal consultation efforts).

Plaintiffs cite BLM's treatment of two sacred sites (Gobernador Knob and Huerfano Mountain) as evidence of a lack of consultation with the Navajo Nation. In its protest of the RMP/FEIS, the Navajo Nation Office of the President expressed concern that the proposed plan could desecrate Gobernador Knob and Huerfano Mountain, two extremely sacred sites, and the President's Office asked "to establish a buffer zone around our natural place of worship." AR 2:108 at 1. The record indicates that BLM has responded to concerns about activities near these sites for 20 years. Both of these areas have been designated as Special Management Areas since 1988, and Gobernador Knob was designated as an ACEC in 1998. In 1999, after significant tribal consultation, BLM denied approval for a proposed well near Gobernador Knob because of tribal concerns. The record also indicates that the Gobernador Knob and Huerfano Mountain sites were addressed as part of the RMP/EIS process, and the new RMP/FEIS adds Huerfano Mesa as an ACEC. Apparently in response to the Navajo Nation protest, the ROD now provides that if current leases (under development since 1948) near the two ACECs or other Traditional Cultural Properties expire, BLM will not lease them again without consulting with the Navajo Nation. ROD at 9.[10] The record indicates that BLM met its requirement to consult in good faith

---

[10] Because a review of an agency's decision considers the entire administrative record, deficiencies in the FEIS or RMP may be rectified by the ROD. *Friends of Marolt Park v. U.S. Dept. of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004); *Colorado Envtl. Coalition v. Dombeck*,

with the Navajo Nation, and the fact that the Nation chose not to follow up its protest by

becoming a plaintiff in this action suggests that its concerns have been or are being addressed.

Finally, Plaintiffs argue that the RMP will adversely impact cultural, historic, and sacred

sites because of its emphasis on oil and gas development, and that "BLM violated NHPA by

failing to analyze and implement protections for tribally significant cultural resources and

historic properties encompassed by existing leases." Plaintiffs' Petition, Doc. 29 at 38.

However, the NHPA only requires that an agency take procedural steps to identify cultural

resources; it does not impose a substantive mandate on the agency to protect the resources. *See*

*Valley Community Preservation v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004). BLM appears

to have met its consultation requirement in this area as well. In planning for the new RMP,

BLM contacted 24 Native American Tribes and 27 Navajo Chapters in an attempt to identify

Traditional Cultural Properties ("TCPs"), which resulted in the identification of 73 known or

potential TCPs. ROD at 9; FEIS at 3-86 to 3-88. Further, the RMP does not authorize any

specific activities, so it cannot currently have a negative impact on cultural resources. As with

Plaintiffs' FLPMA claim, discussed in section 3 of this opinion, to the extent that Plaintiffs claim

the entire RMP is invalid because its emphasis on drilling will prevent the protection of cultural

resources, this is the type of general programmatic attack that is not subject to judicial review in

the absence of a site-specific agency action.

3.   FLPMA

Plaintiffs claim that Defendants violated FLPMA by coming forward with an RMP that

fails to prevent undue and unnecessary degradation ("UUD") of public lands and resources as

required by 43 U.S.C. § 1732(b). They point out that the mandatory UUD standard has been

characterized as the "heart of FLPMA." *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 33

---

185 F.3d 1162, 1173 (10th Cir. 1999) (evaluation of whether plan's  mitigation measures are
sufficiently detailed must consider FEIS and ROD together).

(D. D.C. 2003). Citing an already existing and extreme degree of air and ground impacts in the Planning Area as a result of prior natural resource extraction, Plaintiffs argue that implementation of the RMP/FEIS will result in yet more harm/impacts, resulting in undue degradation of the public lands. They contend that UUD must be addressed at the RMP stage, because it may be impossible to reverse once the ecosystem is past the point of self-restoration. They also point to the fact that the ACECs designated to protect non-mineral values have already been developed at high densities and would be subject to additional infill drilling under all production alternatives analyzed in the RMP/FEIS.

Plaintiffs' claim fails at this stage because their challenge is to the RMP as a whole, rather than to a discrete final agency action authorizing specific activities, and, as such, it is not ripe for review. Although, in their reply brief, Plaintiffs strive to portray their claim as procedural rather than programmatic, their claim still rests on the consequences of future actions. Plaintiffs contend that "FLPMA's UUD provision is a mandatory standard that will be violated by implementation of the RMP/FEIS. *Plaintiffs' Petition,* Doc. 29, at 39. Plaintiffs also "challenge BLM's failure to consider an alternative that prevents further UUD of public lands or provides adequate protections for ACECs." *Plaintiffs' Reply in Support of Petition for Review of Agency Action* [Doc. 55] at 23. As discussed below, because the RMP does not authorize any specific activities, whether UUD occurs depends on how the RMP is implemented in the future. Even that portion of the claim in Plaintiffs' reply that contends that BLM did not sufficiently analyze whether existing impacts in the planning area are resulting in UUD is not currently justiciable, because, without knowing specifically what drilling grants will be made in the future and what remedial programs will be imposed to fight degradation, a court cannot determine whether UUD is an inescapable result of the RMP.

Plaintiffs' programmatic challenge is similar to the one determined to be non-justiciable in *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726 (1998). In that case, the plaintiffs

36

challenged an RMP that they claimed exceeded the Forest Service's statutory authority. The

challenged plan specified a total amount of wood that could be cut from the forest in the Plan

Area, identified certain forest areas for timber production, and determined which methods of

timber harvesting were most appropriate. But, like the RMP in the current case, it did not

authorize any specific action. Before any logging could occur, the Forest Service was required

to approve each specific timber sale pursuant to the governing statute and relevant agency

regulations. The *Ohio Forestry* Court determined that the plaintiffs' claims were non-justiciable

because they had not identified a "concrete" or "site-specific" logging decision that would be

subject to APA review. 523 U.S. at 735, 737.

Plaintiffs' FLPMA claim fails for the same reason as the claim in *Ohio Forestry*. The

RMP simply does not authorize any specific ground-level disturbances. As previously

discussed, under the RMP, all decisions concerning future, site-specific actions such as approval

of an application for a permit to drill are subject to administrative approval, and must include a

detailed NEPA analysis of the likely environmental impacts of the proposed action, as well as a

discussion of appropriate mitigation measures that will be imposed to ensure that environmental

degradation is minimized. ROD at 3.

Under the standard set down in *Ohio Forestry*, to determine if a challenge to an agency's

action is ripe for adjudication, a court "must consider: (1) whether delayed review would cause

hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with

further administrative action; and (3) whether the courts would benefit from further factual

development of the issues presented." 523 U.S. at 733. The *Ohio Forestry* Court found that

delayed review would not cause hardship to the plaintiffs because the RMP did not authorize any

specific action or create or destroy any concrete legal rights, and any decision authorizing timber

cutting would be reviewed on a site-specific basis. The situation is virtually identical in this

case. Second, judicial intervention at this stage could also interfere with further administrative

action. Because site-specific review will enable BLM to consider distinct land use impacts and to refine its policies or adjust the implementation of the RMP accordingly, the Court's involvement at this stage could "interfere with the system that Congress specified for the agency to reach" mineral development decisions. *Id.* at 736. Finally, the facts needed to assess whether the agency has failed in its duty to prevent UUD will not be developed until site-specific action takes place. As noted by the *Ohio Forestry* Court, review of a program at the RMP stage requires "judicial consideration of the details of an elaborate, technically based plan...without benefit of the focus that a particular" site-specific proposal would provide. *Id.* The Court also recognized that the appellate court's attempt to determine "whether or not the Forest Service suffered from a kind of general 'bias' in favor of timber production and clear-cutting" would have benefitted "where the consequences had been 'reduced to more manageable proportions,' and where the 'factual components [were] fleshed out, by some concrete action.'" *Id.* at 736-37 (internal citation omitted). The Court's observation that further factual development is essential is equally apt in this case, where Plaintiffs have argued that "BLM proceeded through this RMP amendment with a singular focus on maximizing oil and gas development." *Plaintiffs' Reply in Support of Petition for Review of Agency Action* [Doc. 55] at 1.

After the decision in *Ohio Forestry*, "generic challenges to the sufficiency of [an RMP] are no longer justiciable. *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1134 (9th Cir. 1999). "Unless a site-specific action is the focus of the complaint, a plaintiff can no longer use FLPMA to challenge an agency's adoption of a programmatic plan. *N. Plains Res. Council v. BLM*, Civ. No. 03-69, 2005 U.S. Dist. LEXIS 4678, at *42 (D. Mont. Feb. 25, 2005). The Tenth Circuit recently applied the *Ohio Forestry* three-part test in dismissing a FLPMA claim as unripe. *See Utah v. U.S. Dep't of Interior*, 535 F.3d 1184 (10th Cir. 2008). *Utah v. DOI* concerned the settlement of a suit between the State of Utah (and an association of its counties) and BLM over BLM's management of state trust lands. A group of environmental organizations intervened,

challenging the parties' settlement of the action.  The district court dismissed the organizations' claims, finding that the dispute was not ripe for adjudication.  One of the organizations challenged that dismissal.  The appellate court agreed that the federal courts lacked jurisdiction over the dispute on ripeness grounds, because whether the settlement violated the FLPMA ultimately depended on how BLM applied the settlement in the context of site-specific land management decisions.  Although *Utah v. DOI* presents a different context than this case, the same principle applies.  As the Circuit wrote, "[w]hen pressed to decide whether agency policies which have not yet been implemented conflict with statutory directives, judicial review must wait until the BLM [policy] is applied in a specific context."  535 F.3d at 1196.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' *Petition for Review of Agency Action* [Doc. 29] is DENIED.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE